Cecilia Chung, State Bar No. 340111
*cecilia@newmanlaw.com*
Derek Newman, State Bar No. 190467
*derek@newmanlaw.com*
Derek Linke, State Bar No. 302724
*linke@newmanlaw.com*
Newman LLP
100 Wilshire Boulevard, Suite 700
Santa Monica, CA 90401
Telephone: (310) 917-1000
Facsimile: (310) 917-1001

Counsel for Plaintiff
Michael Zinna

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL L. ZINNA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES NEWMARK, an individual,<br><br>Defendant. | Case No. 2:23-cv-09418<br><br>**COMPLAINT FOR CYBERSQUATTING**<br><br>**JURY TRIAL DEMANDED** |

Under 15 U.S.C. § 1125(d), Michael Zinna hereby alleges for his complaint against Charles Newmark upon personal information as to Zinna's own activities, and upon information and belief as to the activities of others, as follows:

## NATURE OF THE CASE

1. This is an action for cybersquatting. Newmark registered a series of internet domain names that are identical or confusingly similar to Zinna's name and trademark. Newmark then directed those domain names to a website titled, "Beware of Mike Zinna", where he called Zinna a con man and other derogatory terms. Newmark demanded that Zinna pay him $40,250 for each "Zinna" domain name, amounting to several-hundred-thousand dollars.

2. In a deposition, Newmark testified that if a court or administrative panel orders any of his currently registered "Zinna" domain names transferred from him, he will continue this pattern and register new ones. Zinna seeks damages of $100,000 per domain name under statute, and injunctive relief to stop Newmark's pattern of cybersquatting.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

4. This Court has personal jurisdiction over Newmark because he resides in California.

5. This Court is the appropriate venue under 28 U.S.C. § 1391(b)(1)-(2) because Newmark resides here and his acts giving rise to the claim for relief occurred here.

## PARTIES

6. Plaintiff Michael L. Zinna is an individual who resides in Ventura, California and operates a business in Los Angeles County, California.

7. Defendant Charles Newmark is an individual. Newmark previously resided in Los Angeles, California, no longer has a permanent residence, but, as of

the date of the filing of this amended complaint, is currently residing in a vehicle in Venice, California. Newmark keeps a mailbox at 333 Washington Blvd., # 241, Marina del Rey, CA 90292. At all times herein relevant, Newmark was a resident of California and carried out his actions while in California.

## FACTUAL BACKGROUND

**A.   Michael Zinna is a Hollywood producer and network executive whose name is his brand.**

8.    Michael Zinna is a Hollywood producer and network executive who has successfully used both traditional and new-media sources to bring his unique brand of social commentary and celebrity access to television shows, podcasts, and other media outlets. He has appeared both behind and in front of the camera, including hosting his own talk shows. Over his 20-year career, he has created thousands of segments and shows as producer, director, or performer. "Michael Zinna" is also well known as "Mike Zinna" and simply as "Zinna."

9.    Among Zinna's many producer credits and accomplishments are the Zo What? Morning Show, Here's a Thought With Charles Shaughnessy, and the King Assassin Show. His own talk show, "The World According to Zinna" was one of the earliest examples of a successful live-streamed independent media broadcast. Zinna also hosted numerous live terrestrial FM radio programs including "The Mike Zinna Show", and a PBS television show ("Tough Love with Mike Zinna"). Zinna also launched and produced a LIVE concert series at the famed "Whisky a Go Go" where he hosted and broadcasted on his own namesake streaming network (Zinna.TV), hundreds of performances of some of the biggest stars in music and entertainment history.

10.   As a talk-show host, network executive, and public figure, Zinna interviewed and made public appearances with some of the most compelling and famous political figures and celebrities in the world, including interviews and public appearances with:

- Gene Simmons
- Ozzy Osbourne
- Moby
- Andy Dick
- Billy Idol
- Eric Roberts
- John Salley
- Tommy Chong
- Mark McGrath
- Lou Lombardi
- Jaleel White
- Jerry Rice
- Steven Adler
- Hal Sparks
- Mike Tyson
- Martin Sheen
- Larry Flynt
- Ed Begley Jr.
- Stormy Daniels
- The Soup Nazi
- Dr. John Gray

11. Zinna has continuously used MICHAEL ZINNA, MIKE ZINNA, and ZINNA as trademarks to identify his various services, including television-production services, television- and radio-hosting services, and network-executive services for nearly 20 years.

12. Zinna is the senior user of the name and has established sufficient market penetration to show secondary meaning.

13. Zinna began using his name in commerce when he commenced his media

career in 2003. Zinna relies heavily on his name as his brand. The name Mike Zinna is both memorable and unique, and knowing that a show is created by Mike Zinna has meant that show-business industry partners, celebrities, and the general public recognize that it will be a quality, entertaining, and compelling piece. In Hollywood, producers are known by name more than by company affiliation or any other trademark. For example, knowing that a movie is a George Lucas or a Steven Spielberg production tells both industry insiders and the general public volumes about what to expect and which shows are likely to appeal.

14. Likewise, negative publicity—whether true or not—can be intensely damaging in the show-business world. A reputation for dishonesty, bad moral character, or virtually any negative attribute can mean the difference between a career advancing and stopping dead in its tracks.

15. Zinna has worked carefully to cultivate his reputation and name recognition and is known for both the quality of his work and for being easy to work with and honest. He brands all his productions with his name and uses it as his trademark.

16. Zinna began registering his domain names almost 20 years ago, and owns a total of 14 domain names:

- zinna.biz
- zinna.com
- zinna.dev
- zinna.info
- zinna.life
- zinna.me
- zinna.media
- zinna.mobi
- zinna.org
- zinna.tech

- zinna.tv
- zinna.us
- zinna.website
- zinna.world

17. Zinna also owns the Twitter (now X) handle @zinna and has posted 3,600 tweets using that moniker. This is a significant accomplishment as Zinna is one of the rare individuals in the world who actually has his surname on Twitter (now X). He further owns the Instagram handle @mikezinna.

18. Zinna owns these domain names and social media handles because he knows that show-business professionals rely heavily on internet searches for information about potential business partners.

**B.   Newmark surreptitiously registered a series of Infringing Domains and created a disparaging website to obtain money from Zinna.**

19. Newmark is a former actor who now makes his living from a variety of jobs.

20. Newmark has attempted to generate income by registering domain names at a standard retail price with the goal of selling them to trademark owners and others at extortionate prices.

21. Newmark registers these domain names secretly using a company called Domains By Proxy to shield Newmark's identity from the domain-name registration records.

22. Newmark currently owns approximately 500 domain names, none of which he uses for a business or other legitimate purpose. Rather, he warehouses the names, hidden behind Domains By Proxy, and keeps them unavailable to register until someone looking for them reaches out to buy them from him.

23. Congress has recognized that domain-name registrants who acquire domain names that are identical or confusingly similar to trademarks create special problems. Called cybersquatting, Congress held that the practice:

(A) Results in consumer fraud and public confusion as to the true source or sponsorship of goods and services;

(B) Impairs electronic commerce, which is important to interstate commerce and the United States economy;

(C) Deprives legitimate trademark owners of substantial revenues and consumer goodwill; and

(D) places unreasonable, intolerable, and overwhelming burdens on trademark owners in protecting their valuable trademarks.

24. Newmark decides to list a domain for sale when his broker advises him to do so or when he believes he can sell it for a profit.

25. Newmark sets the sales price of a domain name personally. He decides the value based on what he believes a buyer will pay, and admits to intentionally raising prices when a party demonstrates interest in a domain.

26. Starting in 2020, Newmark registered the following domain names (along with mikezinna.info, the "Infringing Domains"):

- Zinnatechmedia.com
- MikeZinna.net
- MikeZinna.org
- MichaelZinna.com
- MikeZinna.com
- MichaelZinna.net
- MichaelZinna.info
- MichaelZinna.org
- ZinnaWorldwideMedia.com

27. The Infringing Domains all redirected to a website entitled "Beware of Mike Zinna" (the "Website").

**C.   The Website contains statements that falsely portray Zinna as a con artist.**

28.   The Website includes the following false and defamatory statements:

- "Mike Zinna : Con Artist"
- "Mike Zinna is known for conning people into investing in his bogus companies. He keeps no company records anywhere."
- "Mike Zinna is also known to use romance and charm to steal money from unsuspecting women."
- "You will never get your money back."
- "Would you like to find out more about Michael Zinna aka Mike Zinna or how he scams people? Contact us."
- "It is our opinion that he is a con man."

29.   The Website also includes the following false statements repeated from lawsuits against Zinna:

- "ZINNA misrepresented that he was involved with the mafia."
- "ZINNA used his purported mafia connections to threaten and strong-arm the Plaintiffs and to make veiled threats against them."

30.   The Website also includes a cartoon figure of a gangster filled with dozens of words purportedly drawn from lawsuits against Zinna and about Zinna, including "instability," "disrespect," "infirmity," and "impotence."

31.   Newmark created the Website.

32.   Newmark published information on the Website relating to litigation involving companies that Mr. Zinna did not own or control, but where he was merely employed or a minority partner. The publication gives the false impression that Zinna was responsible for the companies' alleged bad acts.

33.   In the cases where Zinna was a litigant, Zinna vigorously contested the allegations in the lawsuits and ultimately the claims were dismissed or otherwise appropriately resolved.

34.   Zinna contacted Newmark and advised Newmark that the allegations are

false and must be removed.

35. Google searches for "Mike Zinna" and "Zinna" lead to links to the Website published through one or more of the Infringing Domains in near the top of search results . Consequently, a person searching for Michael Zinna or Mike Zinna is very likely to see the "Beware of Mike Zinna" website.

36. A consumer or potential business partner viewing the Website is likely to be concerned that the allegations are true and is likely to hesitate to do business with Zinna.

37. Newmark published on the Website that the Infringing Domains were for sale. He offered them for tens of thousands of dollars knowing that only Zinna would pay such a ransom for the Infringing Domains.

**D. Newmark demanded almost $400,000 for domain names directing to the Website.**

38. Using a broker—and keeping his identity secret—Newmark attempted to sell the Infringing Domains repeatedly to Zinna with ever-increasing price demands. Ultimately, Newmark demanded $40,250 for each Infringing Domain Name.

39. Newmark created the Website solely for the purpose of coercing Zinna to purchase the Infringing Domains at grossly inflated prices and to give in to extortionate demands that he pay money to take the Website down. The Website contains false information while literally simultaneously advertising the Infringing Domains for sale with a top banner. The only conceivable buyer for these domains at hundreds if not thousands of times their market value would be Zinna himself.

40. GoDaddy is a domain-name registrar and broker. According to GoDaddy's domain-name appraisal tool, the Infringing Domains are valued far less than the price demanded. MichaelZinna.com is valued at $1,653. MikeZinna.com is valued at $1425, and MichaelZinna.org is valued at $415. The rest are valued at less than $200. Comparable domain names, such as MikeZinna.xyz or MikeZinn.com,

can be registered for less than $22. This pricing is consistent with Zinna's understanding of the actual value of the Infringing Domains. Zinna has previously registered some of the Infringing Domains for the cost of registration only, demonstrating that there is no real interest in the Infringing Domains other than to attempt to get Zinna to buy them for much more than they are worth.

41. Newmark listed the Infringing Domains for sale at increasingly escalated prices. None sold.

42. Newmark believes that Zinna will pay far more than market value for the Infringing Domains because Newmark used them to defame and otherwise spread false information about Zinna.

43. Newmark was using the Infringing Domains for the bad-faith purpose of driving up the price of the Infringing Domains so that Zinna will pay an above-market value for them.

44. Newmark did not register the Infringing Domains for the purpose of fair comment about Zinna. If that were the case, Newmark would not have several times attempted to sell the domain names to Zinna at exorbitant sums. Rather, Newmark created and published the Website made available through the Infringing Domains to upset Zinna and cause him to pay an extortionate sum for the Infringing Domains.

45. As further evidence of bad faith by Newmark, two of the Infringing Domains were registered for the first time by Newmark after Zinna contacted the domain broker to attempt to purchase the Infringing Domains.

46. The domain name ZinnaWorldwideMedia.com (a company with which Zinna was formerly associated) was registered the same day that Zinna contacted the GoDaddy broker.

47. The domain name MikeZinna.org was registered the following day while Zinna was negotiating with GoDaddy to purchase the Infringing Domains for the asking price of $2000, which then quickly shot up to $12,000.

48. While these two domains were likely registered for under $10 each, Newmark listed MikeZinna.org for sale on GoDaddy for $40,250 and Newmark currently has ZinnaWorldwideMedia.com listed for sale on GoDaddy for $35,000.

49. During a deposition conducted in another case, Newmark admitted that he registered the Infringing Domains for the purposes of extracting money from Zinna.

**E.  After Zinna won an administrative decision finding Newmark a cybersquatter, Newmark then registered new Infringing Domains.**

50. On June 15, 2023, Zinna filed a Uniform Domain-Name Dispute-Resolution Policy (UDRP) complaint against Newmark.

51. The UDRP is an administrative proceeding that allows a trademark owner to initiate legal action against a domain-name registrant for registering in bad faith a domain name that is similar to the trademark owner's trademark. The remedy for a winning UDRP complaint is that the domain names at issue are transferred from the respondent/cybersquatter to the complainant.

52. On June 15, 2023, Zinna filed a UDRP complaint against Newmark. On July 31, 2023, Newmark responded in writing and admitted that he began "registering the subject domain names and posting the factual information relating to Complainant's sordid history in approximately March 2020."

53. On August 22, 2023, the UDRP panel issued a ruling finding that Newmark registered the Infringing Domains (except for mikezinna.com, which was registered later) in bad faith and concluding that Newmark's motivation was not free speech but financial gain. The panel's order is attached as **Attachment A**.

54. The panel's order transferred the Infringing Domains to Zinna, but the panel is not empowered to award damages or injunctive relief. Following the transfer, the Website no longer appeared on any Google searches.

**F.     Newmark immediately registered new Infringing Domains redirecting to the Website and intends to keep doing so.**

55.    During a deposition, Newmark admitted that promptly following the UDRP resolution, he registered a new group of Infringing Domains, including mikezinna.info and others. He linked those names to the Website and they are again available for public view, and climbing the Google rankings. At least mikezinna.info is listed for sale. Newmark stated in his deposition that he would continue to register new "Zinna" domain names if the current ones are taken from him through another UDRP or court process.

**G.     Zinna is suffering ongoing harm from Newmark's actions.**

56.    Zinna is a successful media producer and network executive, and the Founder & CEO of a multi-million dollar enterprise. He has millions of dollars in investments entrusted to him via his commercial ventures and has achieved successful contracts to pursue future projects. He also has numerous prospective contracts in process and anticipates rapid growth. Many of Zinna's colleagues are familiar with the Website. Some have expressed concerns. False allegations of being dishonest or a con man can cause ongoing business harm in the media industry.

57.    Google ranks sites according to the number of internet hits based on a given search. For example, an internet search for "diet coke" results in a Coca-Cola company website listed first in Google search results, followed by Wikipedia and then Amazon's Diet Coke pages. A search for "Michael Zinna" after the Infringing Domains were transferred to Zinna but before September 1, 2023 resulted in no search results shown for the Website. Following September 1, 2023, the Website again began appearing in Google search results because the mikezinna.info domain name linked to it. Since then, the Website has steadily gone up the list of search results, demonstrating that persons are viewing it. The rate of increase makes it unlikely that internet searchers are independently finding the

Website; instead, Newmark is likely actively promoting it on the internet.

58. Zinna has been harmed and continues to be harmed by the presence of the Website located at domain names that are identical or confusingly similar to his trademark. Zinna's harm is difficult to quantify because Zinna is losing business opportunities that he will not know would have existed but for the fact that internet users are confused by websites linked to his name and presenting false or misleading information about him. And Zinna's harm increases with each passing day that the Website remains linked to his name and Newmark promotes it because the number of persons viewing it increases as the Website become more popular and is listed higher on Google search results.

## CLAIM FOR RELIEF
### Cybersquatting, 15 U.S.C. § 1125(d)

59. Zinna adopts by reference each of the allegations above.

60. Newmark registered, trafficked in, or used the Infringing Domains.

61. The Infringing Domains are each identical or confusingly similar to Zinna's name, which he has continuously used as a trademark since at least 2003.

62. Newmark registered, trafficked in, or used the Infringing Domains in bad faith and with a bad-faith intent to profit from Zinna's name.

63. Zinna's trademark was distinctive at the time of Newmark's registration of the domain names.

64. Newmark does not have any intellectual property rights or other rights in Zinna's name.

65. Newmark has not made any prior use of the Infringing Domains in connection with the bona fide offering of goods or services.

66. Newmark has not made any bona fide fair use of Zinna's name in a website accessible under any of the Infringing Domains.

67. Newmark has registered multiple domain names which he knows are identical or confusingly similar to the mark of others that are distinctive at the time

of registration.

68. The Infringing Domains are identical or confusingly similar to Zinna's personal name, which is protected as a mark.

69. Newmark's registration, use, or trafficking in the Infringing Domains constitutes cybersquatting in violation of 15 U.S.C. § 1125(d).

70. Newmark's conduct has irreparably harmed and, if not enjoined, will continue to irreparably harm the general public who has an inherent interest in being free from confusion, mistake, and deception.

71. As a proximate result of Newmark's conduct, Zinna has suffered, and unless Newmark is enjoined, will continue to suffer, damage to his reputation and goodwill, and injury to the current and potential customer base and investors of his businesses which offer services associated with Zinna's name, trademark, and leadership.

72. Alternatively, at Zinna's election under 15 U.S.C. § 1125(d), instead of actual damages and profits, Zinna is entitled to an award of statutory damages in the amount of $100,000 for each of the ten Infringing Domains for a total of $1,000,000.

73. Newmark committed his wrongful acts willfully and with notice of Zinna's rights. This is an exceptional case under 15 U.S.C. § 1117(1)(3), making Zinna eligible for an award of his reasonable attorneys' fees.

**PRAYER FOR RELIEF**

Zinna respectfully requests a Judgment as follows:

1. For preliminary and permanent injunctive relief;
2. For actual damages according to proof;
3. In the alternative, to an award of statutory damages under 15 U.S.C. § 1117(d) in the amount of $1,000,000 plus $100,000 for any other domain names that Newmark registered that are identical or confusingly similar to Zinna's name;

4. A judgment, order, or injunction under 15 U.S.C. § 1125(d)(2)(C) directing Newmark to transfer every internet domain name that he owns which is identical or confusingly similar to Zinna's trademark, and prohibiting Newmark from registering any additional domain names similar to Zinna's trademark;

5. An award of Zinna's reasonable attorneys' fees and costs;

6. For costs of the lawsuit; and

7. For such other and further relief at law and in equity to which the Court deems appropriate.

Dated: November 7, 2023

Newman LLP

s/ Cecilia Chung
Cecilia Chung, State Bar No. 340111
*cecilia@newmanlaw.com*
Derek Newman, State Bar No. 190467
*derek@newmanlaw.com*
Derek Linke, State Bar No. 302724
*linke@newmanlaw.com*
100 Wilshire Blvd., Suite 700
Santa Monica, CA 90401
Telephone: (310) 917-1000
Facsimile: (310) 917-1001

Counsel for Plaintiff
Michael Zinna